| | |
|---|---|
| WILLIE LEE BROWN, JR. | CIVIL ACTION 1:15-CV-02885 |
| VERSUS | JUDGE TRIMBLE |
| UNITED STATES COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION | MAGISTRATE JUDGE PEREZ-MONTES |

## REPORT AND RECOMMENDATION

I. Background

Willie Lee Brown, Jr. ("Brown") filed an application for supplemental security income ("SSI") benefits on March 15, 2013, alleging a disability onset date of March 4, 2013 (Doc. 11-1, p. 124/257) due to seizures (Doc. 11-1, pp. 160/257). That claim was denied by the Social Security Administration ("SSA") (Doc. 1-11, p. 70/257).

A *de novo* hearing was held before an administrative law judge ("ALJ") on July 9, 2014, at which Brown appeared with a vocational expert ("VE") and a witness (Doc. 11-1, p. 39/257). Brown was unrepresented. The ALJ found that, although Brown suffers from a severe impairment of seizure disorder (Doc. 11-1, p. 30/257), he has the residual function capacity to perform medium work, except that he must avoid hazards such as unprotected heights, dangerous moving machinery, and heavy automotive equipment (Doc. 11-1, p. 31/257). The ALJ further found that Brown, who

was 33 years old and has a limited education,[1] can do work that exists in substantial numbers in the national and local economies (Doc. 11-1, pp. 32-33/257). The ALJ concluded that Brown was not disabled from March 4, 2013 (the date his application was filed[2]) through the date of his decision on September 12, 2014 (Doc. 11-1, p. 34/257).

Brown requested a review of the ALJ's decision, but the Appeals Council declined to review it (Doc. 11-1, p. 5/257). The ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Brown next filed this appeal for judicial review of the ALJ's decision. Brown raises the following issues for review on appeal (Doc. 15):

1. The Appeals Council committed reversible error in failing to remand this matter to the ALJ for consideration of the newly submitted evidence.

2. The ALJ failed to properly evaluate Brown's subjective complaints and credibility.

3. Brown did not receive a full and fair hearing because he did not knowingly and intelligently waive his right to counsel and was prejudiced by the ALJ's failure to develop a full and fair record.

The Commissioner responded to Brown's appellate brief (Doc. 19), and Brown filed a reply (Doc. 20). Brown's appeal is now before the Court for disposition.

---

[1] Brown completed the eighth grade (Doc. 11-1, p. 161/257).

[2] The earliest month for which an eligible SSI claimant can receive benefits is the month following the month his application was filed, 20 C.F.R. § 416.335, or the month following the month during the pendency of the application that the claimant meets all the eligibility requirements, 20 C.F.R. § 416.330(a).

II.  Administrative Record

   A.  Medical Records

In November 2008, Brown was evaluated for dizziness and headaches, and his history of seizures was noted (Doc. 11-1, p. 195-/257). Neurofibromatosis[3] was diagnosed (Doc. 11-1, p. 195/257).

In January 2011, Brown was examined for a "right eye 'bump'." An infected epidermal cyst was found (Doc. 11-1, p. 194/257).

In October 2011, Brown was treated for shortness of breath and wheezing, and diagnosed with asthma, seizures, and neurofibromatosis (Doc. 11-1, p. 193/257). Brown was prescribed Xopenex (Levaluterol Oral Inhalation), Albuterol, and other medications (Doc. 11-1, p. 193/257).

---

[3] Neurofibromatosis-1 ("NF-1") is an inherited disorder in which nerve tissue tumors (neurofibromas) form in the bottoms layer of skin (subcutaneous tissue) and nerves from the brain and spinal cord. NF causes tissue along the nerves to grow uncontrollably. This growth can put pressure on affected nerves. If the growths are in the skin, there are no major symptoms. If the growths are in other nerves or parts of the body, they can cause pain, severe nerve damage, and loss of function in the area the nerve affects. Problems with feeling or movement can occur, depending on which nerves are affected. Café-au-lait spots are the hallmark symptom of NF. Other symptoms may include: tumors of the eye; seizures; freckles in the underarm or groin; large, soft tumors called plexiform neurofibromas, which may have a dark color and may spread under the surface of the skin; pain from affected nerves; and small, rubbery tumors of the skin called nodular neurofibromas. Signs include colored, raised spots on the iris of the eye, fracture of the lower leg in early childhood, freckling in the armpits, groin, or underneath the breast in women, large tumors under the skin, which can affect the appearance and put pressure on nearby nerves or organs, many soft tumors on the skin or deeper in the body, and mild cognitive impairment, attention deficit hyperactivity disorder, and learning disorders. MEDLINEplus Health Information, Medical Encyclopedia: Neurofibromatosis-1, *available at* https://medlineplus.gov/ency/ article/000847.htm (a service of the U.S. National Library of Medicine and the National Institutes of Health).

NF-2 is a disorder in which tumors form on the nerves of the brain and spine (the central nervous system). It is a different and separate condition than NF-1. Signs include brain and spinal tumors, hearing-related tumors, and skin tumors.

In March 2012, Brown had increased seizure activity, was diagnosed with grand mal seizures, and was prescribed Depakote and Dilantin (Doc. 11-1, p. 192/257). In June 2012, Brown had a small lesion and neurofibromatosis on his left arm (Doc. 11-1, p. 191/257).

Brown was evaluated in November 2012 for complaints of back pain, and in December 2012 for complaints of right groin pain (Doc. 11-1, pp. 189-90/257). Brown was prescribed Flexeril and Ibuprofen (Doc. 11-1, p. 190/257).

In April 2013, Brown had a seizure, fell, and suffered right wrist pain (Doc. 11-1, p. 239/257). A neurology consult was requested by the SSA (Doc. 11-1, p. 222/257). Dr. Gerald Dzurik, a non-examining SSA consultant,[4] recommended hazard precautions for Brown (Doc. 11-1, p. 227/257).

In October 2013, Brown was evaluated again for complaints of back pain in his lumbar spine (Doc. 11-1, p. 235/257). Brown was diagnosed with back problems and tests were ordered (Doc. 11-1, p. 235/257).

In October 2014, Dr. W. David Thompson wrote that he has been familiar with Brown's medical condition for many years (Doc. 11-1, p. 255/257). Dr. Thompson stated that Brown has one or more Grand Mal seizures per month and one or more Petit Mal seizures per week, and it is not uncommon for Brown to have four or more Petit Mal seizures per week (Doc. 11-1, p. 255/257). Dr. Thompson explained that Brown's seizures are convulsive and occur both day and night, even on large doses of medication (Doc. 11-1, p. 255/257).

---

[4] Dr. Dzurik is a pediatrician, and is described by the SSA as a neurology specialist.

4

In April 2015, Brown was treated for chest pain and nose bleed, diagnosed with epistaxis and seizure disorder, and prescribed Depakote and Dilantin (Doc. 11-1, p. 22/257). In July 2015 Brown was treated for dizziness, diagnosed with Dilantin toxicity, and his Dilantin was decreased (Doc. 11-1, p. 20/257).

### B.     Administrative Hearing

At the July 2014 administrative hearing, The ALJ noted that Brown was unrepresented, that the hearing had already been postponed once so Brown could try to find another attorney, and an attorney had enrolled for Brown but later withdrawn (Doc. 11-1, p 42/257). Brown's mother (Lula Brown) explained they had been unable to find an attorney (Doc. 11-1, pp. 42-43/257). The ALJ said they would have to hold the hearing without one, and the record would show that Brown had waived his right to representation since he had not been able to get an attorney (Doc. 11-1, pp. 42-43/257).

Brown testified that he was 34 years old, single, and lived his mother, his sister, and his sister's two children (Doc. 11-1, p. 44/257). Brown finished the eighth grade, but did not go farther in school due to his seizures (Doc. 11-1, pp. 44-5/257). Brown can read, write, add, and subtract (Doc. 11-1, p. 45/257). Brown is 5' 8" or 5' 9" tall, weighs 128 pounds, and is right-handed (Doc. 11-1, p. 45/257).

Brown testified that he has no income of any kind, and his mother takes care of him (Doc. 11-1, p. 446/257). Brown last worked in 2005, as a newspaper inserter for about three years (Doc. 11-1, p. 47/257). Before that, Brown washed cars for a trucking company (Doc. 11-1, p. 47/257).

5

Brown testified that he cannot return to work because he has a seizure every time he starts a job, so he is fired (Doc. 11-1, p. 57/257). Brown also testified he has a seizure when he gets overheated (Doc. 11-1., pp. 47/48). Brown overheated and had seizures when he was washing cars, so he was laid off (Doc. 11-1, p. 48/257). Sometimes Brown overheated hot when he was inserting for the newspaper (Doc. 11-1, p. 48/257).

Brown testified that he has seizures once or twice a week, sometimes more (Doc. 11-1, p. 48/257).

Brown further testified that he has back problems, and has had back pain since he was young (Doc. 11-1, pp. 49-50/257).

Brown testified that, during the day, he visits him mom or his father, and sits around with them (Doc. 11-1, p. 50/257). He helps his mother with the work indoors and outdoors (Doc. 11-1, p. 51/257). He never learned to drive (Doc. 11-1, p. 51/257). Brown has never seen a psychiatrist (Doc., 11-1, p. 51/257). Brown has not smoked cigarettes in six years; he does not drink alcohol and never has; and he used illegal drugs over ten years ago (Doc. 11-1, p. 51/257).

Brown testified that he could lift about 120 pounds without difficulty (Doc. 11-1, p. 52/257). Brown could sit without pain, and walk or stand without difficulty (Doc. 11-1, p. 52/257).

Brown's mother, Lula Brown, testified that Brown takes a lot of medication for seizures, but has "break-through" seizures anyway (Doc. 11-1, p. 53/257). Lula Brown also testified that Brown could no longer work with "his hand" (Doc. 11-1, p. 53/257).

6

The VE testified that Brown's past work as a newspaper inserter was light work,[5] SVP 1,[6] and DOT 794.687-058[7] (Doc. 11-1, p. 54/257). The VE further testified that Brown's past work as a car washer was medium work,[8] SVP 1, and DOT 919.587-014 (Doc. 11-1, p. 54/257).

The ALJ posed a hypothetical involving a person of Brown's age, education, and work experience, that can do medium level work, but cannot work at unprotected heights or around dangerous moving machinery or heavy automotive equipment (Doc. 11-1, p. 55/257). The VE testified that such a person could do his past work (Doc. 11-1, p. 55/257). The VE further testified that such a person could also work as a janitor (medium work, SVP 2, DOT 381.687-018, 2,059,000 in the nation and 27,900 in Louisiana); a bagger (medium work, SVP 2, DOT 920.687-014, 677,000 jobs in the nation and 3400 in Louisiana); or cutlery maker (medium work, SVP 2, DOT 317.684-010, 803,000 jobs nationally and 30,000 in Louisiana) (Doc. 11-1, p. 55/257).

---

[5] "Light work" is defined in 20 C.F.R. § 404.1567(b) and § 416.967(c): "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."

[6] SVP, or Specific Vocational Preparation, refers to the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a particular occupation. See Dictionary of Occupational Titles ("DOT"), App. C (rev. 4th ed.1991). Unskilled work usually requires less than thirty days training, which corresponds to an SVP of 1 or 2; semi-skilled work corresponds to an SVP of 3 or 4; and skilled work requires an SVP level of 5 or higher. Social Security Ruling 00–4p, 2000 WL 1898704, at *3 (2000). See also generally 20 C.F.R. § 404.1568.

[7] Dictionary of Occupational Titles (Dept. of Labor).

[8] "Medium work" is defined in 20 C.F.R. § 404.1567(c) and § 416.967(c): "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary work and light work."

7

The ALJ posed a second hypothetical involving the same person but who is limited to light or sedentary work with the same limitations (Doc. 11-1, p. 56/257). The VE testified that such a person could work as a newspaper inserter; silver wrapper (light work, SVP 1, DOT 318.687-018, 506,000 jobs existing in the nation and 6300 in Louisiana); counter clerk (light work, SVP 2, 249.366-010, 415,000 jobs in the nation and 4,600 jobs in Louisiana); assembler (sedentary work,[9] SVP 2, DOT 734-687-01, 229,000 jobs in the nation and 6,700 jobs in Louisiana); stone setter (sedentary work, SVP 2, DOT 735.587-034, 218.740 jobs in the nation and 6,350 in Louisiana); and telegraph service rater (sedentary work, SVP 2, DOT 214.587-010, 485,820 jobs in the nation and 5,870 in Louisiana) (Doc. 11-1, pp. 56-7/257).

The VE further testified that, if the hypothetical person needed to take additional breaks during the day, such as one in the morning and one in the afternoon, he would not be able to do any work (Doc. 11-1, p. 57/257).

C. ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Brown (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work

---

[9] Sedentary work is defined in § 404.1567(a): "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."

8

he did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. See Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120 (1995) (citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. See Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Brown has not engaged in substantial gainful activity since March 4, 2013, and that he has a severe impairments of seizure disorder, but that he does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Doc. 11-1, p. 30/257). The ALJ also found that Brown has never worked at the substantial gainful activity level (Doc. 11-1, p. 32/257).

At Step No. 5 of the sequential process, the ALJ further found that Brown has the residual functional capacity to perform the full range of medium work, except he must avoid hazards such as unprotected heights, dangerous moving machinery, and heavy automotive equipment (Doc. 11-1, p. 31/257). The ALJ found that the claimant is a younger individual with a limited education and no transferable work skills (Doc.

11-1, pp. 32-33/257). The ALJ concluded that there are a significant number of jobs in the national economy that Brown can perform, such as janitor, bagger, coffeemaker, silver wrapper, counter clerk, assembler, stone setter, or "telegraph serve rater" (Doc. 11-1, pp. 32-33/257) and, therefore, Brown was not under a "disability" as defined in the Social Security Act at any time through the date of the ALJ's decision on September 12, 2014 (Doc. 11-1, p. 34/257).

III. <u>Law and Analysis</u>

　A. <u>Scope of Review</u>

In considering Social Security appeals, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. See <u>McQueen v. Apfel</u>, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. See <u>Falco v. Shalala</u>, 27 F.3d 160, 162 (5th Cir. 1994) (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence, which support the Commissioner's decision, but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. See <u>Singletary v. Bowen</u>, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. See <u>Fraga v.</u>

Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. See Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981); see also Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law. See Dellolio, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." See Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

### B. The new medical evidence submitted to the Appeals Council provides a basis for changing the ALJ's decision.

Brown contends the Appeals Council committed reversible error by failing to remand this matter to the ALJ for consideration of the newly submitted evidence. Brown is referring to his medical records from October 2013 through July 2015, including the statement from Dr. Thompson. The Appeals Council stated that information did not provide a basis for changing the ALJ's decision, and suggested that Brown file a new claim based on that information (Doc. 11-1, p. 6/257). Brown also alleges the ALJ failed to properly evaluate Brown's subjective complaints and credibility.

Dr. Thompson's statement concerned Brown's medical condition over the last several years, and did not refer to a recent change in his condition. Therefore, it does not support a new claim for disability.[10]

The ALJ found that Brown's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms, but that his allegations of debilitating symptoms are not wholly credible (Doc. 11-1, p. 32/257). The ALJ stated that Brown's "poor work history while enjoying good health undermines the credibility of [his] allegations that he now is unable to sustain employment due to poor health" (Doc. 11-1, p. 32/257). The ALJ further noted that Brown did not state he had difficulty dressing, bathing, caring for his hair, shaving, feeding himself, toileting, preparing meals, cleaning, washing laundry, ironing, making small household repairs, mowing, and shopping (Doc. 11-1, p. 32/257). The ALJ found that Brown's "treatment has been generally successful in controlling [his] symptoms" (Doc. 11-1, p. 32/257).

Dr. Thompson's statement refutes the ALJ's finding that Brown's treatment was successfully controlled his seizures. Lula Brown also pointed out the fact that Brown has seizures despite his medication. The fact that Brown is taking large doses of Dilantin and Depakote, large enough to have suffered Dilantin toxicity, and still has seizures stands out in this record. The ALJ erred in finding Brown's treatment has been successful in controlling his seizures.

---

[10] The deterioration of a claimant's medical condition after the date of the Commissioner's decision may form the basis of a new claim. Johnson v. Heckler, 767 F.2d 180, 183 (5th Cir. 1985).

The ALJ's finding that Brown had a poor work history "while enjoying good health" is likewise erroneous. Brown's testimony indicates that he lost both of his jobs, as an inserter and a car washer, due to his seizures. Brown also testified that he has suffered a seizure when he has attempted to start a new job, and been fired because of it. Although the ALJ correctly found that Brown is physically able to perform medium work activities, he failed to make any findings concerning the evidence of Brown's inability to keep a job after he has seizures at work.

Additionally, as Brown points out, the ALJ misstated Brown's activities of daily living in his decision. Brown stated in his application that he is unable to take a bath due to the likelihood of a seizure and his mother's difficulty getting him out of the tub; he cannot use the stove in case he has a seizure while doing so; he has to be watched while he mows in case he has a seizure; he cannot drive due to his seizures; his seizures cause memory problems; and he stays at home because of his frequent seizures (Doc. 11-1, pp. 152-54/257).

Brown also contends the ALJ erred in finding he is non-compliant with his medications. The only reference to medication compliance in the ALJ's decision is the statement that lab tests showed Brown's Depakote levels were low sometimes (Doc. 11-1, p. 31/257). The ALJ did not make a finding that Brown had been non-compliant with his medications. However, Brown argues the ALJ should have obtained information from his treating physician regarding why the levels were low. See S.S.R. 87-6, "Titles II and XVI: the Role of Prescribed Treatment in the Evaluation of Epilepsy." Brown further argues that, since there was evidence that

seizures were occurring despite anticonvulsant therapy, the ALJ should have sought information to determine whether they were occurring due to noncompliance with medication or due to other factors. See S.S.R. 87-6. The ALJ did not seek any additional information.[11]

Finally, Brown's diagnosis of neurofibromatosis was not mentioned, explored, or considered by the ALJ, despite the fact that it may be the cause of his seizures and other symptoms.

Therefore, the new medical evidence submitted (by Brown's new counsel) to the Appeals Council provides a basis for changing the ALJ's decision. Since substantial evidence does not support the conclusions of the ALJ and the Appeals Council, their decisions are incorrect as a matter of law. However, this does not entitle Brown to a decision in his favor based upon the existing record. The record is simply inconclusive as to whether Brown can hold a job, given his true impairments. Therefore, Brown's case should be remanded to the Commissioner for further proceedings.

### C. Brown did not receive a full and fair hearing.

Brown contends he did not receive a full and fair hearing because he did not "knowingly and intelligently" waive his right to counsel. Brown also contends he was prejudiced by the ALJ's failure to develop a full and fair record.

---

[11] The record indicates that Brown was taking other anticonvulsants as well as Depakote (such as Dilantin) (Doc. 11-1, p. 197/257). Dr. Dzurik noted that Brown's medical records did not say anything about noncompliance; there were times when Brown's prescription refill may not have been sufficient to last until the next refill; and sometimes he was prescribed Dilantin (Doc. 11-1, p. 224/257).

A claimant has a statutory right to counsel at Social Security hearing. <u>Clark v. Schweiker</u>, 652 F.2d 399, 402-403 (5th Cir. 1981). The ALJ has a duty to inform the claimant, at the hearing, of the manner in which an attorney can aid in the proceedings, the possibility of free counsel or a contingency fee arrangement, and the limitation of attorney fees to 25% of past due benefits and the required court approval of the fees.[12] <u>Clark v. Schweiker</u>, 652 F.2d 399, 403 (5th Cir. 1981); <u>Gullett v. Chater</u>, 973 F. Supp. 614, 620 (E.D. Tex. 1997).

At his hearing, Brown signed a waiver of counsel on the day of his hearing (Doc. 11-1, p. 123-257). However, as the transcript shows, Brown did not voluntarily forego his right to counsel, but explained he had not been able to find an attorney to represent him. The facts that Brown retained an attorney who withdrew before the hearing, and retained another attorney after the hearing (for this appeal), are indications that Brown wanted an attorney. It is clear the ALJ simply did not want to postpone the hearing a second time.

However, a claimant who does not validly waive his right to counsel must prove that he was prejudiced thereby in order to merit reversal of the ALJ's decision. See <u>Brock v. Cater</u>, 84 F.3d 726, 728 (5th Cir. 1996). The ALJ's obligation to develop a full and fair record rises to a special duty when an unrepresented claimant unfamiliar with the hearing procedure appears before him. This duty requires the ALJ to scrupulously and conscientiously probe into, inquire, and explore for all relevant facts. The failure of the ALJ to develop an adequate record is not grounds for reversal

---

[12] It appears the ALJ explained Brown's right to an attorney the first time they met for a hearing, which was then postponed.

*per se*. The claimant must, in addition, show that he was prejudiced as a result of a scanty hearing. He must show that, had the ALJ done his duty, he could and would have adduced evidence that might have altered the result. The duty does not exact a lengthy hearing or protracted inquiry. It does exact a careful effort to make a complete record. See Kane v. Heckler, 731 F.2d 1216, 1219-20 (5th Cir. 1984); see also Brock v. Chater, 84 F.3d 726, 728 (5th Cir. 1996); Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991); James v. Bowen, 793 F.2d 702, 704 (5th Cir. 1986).

Brown's case was poorly presented by Brown, possibly due to his limited education. The ALJ did little to develop the record with testimony as to Brown's seizures,[13] and failed to develop the record with regard to Brown's diagnosis of neurofibromatosis.

Therefore, Brown's case should be remanded to the Commissioner for consideration of all of the medical evidence, and further development of the effects of all of Brown's medical conditions on his ability to work and hold a job, with the assistance of counsel.

## IV. Conclusion

Based on the foregoing, IT IS RECOMMENDED that Brown's appeal be GRANTED, the final decision of the Commissioner be REVERSED, and Brown's case be REMANDED to the Commissioner for: (1) development of the medical evidence, including the diagnosis of neurofibromatosis; and (2) appropriate evaluation of the

---

[13] Listing 11.00 provides guidance on the testimony and evidence necessary to show disability due to seizures.

effects of Brown's medical condition on both his ability to work and his ability to maintain employment.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. No other briefs (such as supplemental objections, reply briefs, etc.) may be filed. Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers at Alexandria, Louisiana on this 11th day of May, 2017.

Joseph H.L. Perez-Montes
United States Magistrate Judge